UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICHAEL SHERIDAN,<br><br>     Plaintiff,<br><br>  v.<br><br>BRENT REINKE; CMS d/b/a CORIZON, INC.; PHILIP VALDEZ; NORMA RODRIGUEZ; MADDOX; JUSTIN ACOSTA; CHRISTOPHER ROSE; SERGEANT KERR; CHARLES FLETCHER; and CORRECTIONS CORPORATION OF AMERICA,<br><br>     Defendants. | Case No. 1:10-cv-00359-EJL<br><br><br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court are the following motions: (1) Plaintiff's Motion for Leave to File Affidavit (Dkt. 85); (2) CCA Defendants' Objection to Plaintiff's Motion for Leave to File Affidavit and Motion to Strike Affidavit (Dkt. 86); (3) CCA Defendants' Motion for Summary Judgment (Dkt. 91); (4) Defendant Corizon, Inc.'s Motion for Summary Judgment (Dkt. 95); (5) Defendant Reinke's Motion for Summary Judgment (Dkt. 96); (6) Plaintiff's Motion for Leave to File Supplemental Pleadings Rule

**MEMORANDUM DECISION AND ORDER- 1**

15 Fed. R. Civ. Procedure (Dkt. 107); and (7) Motion for Supplemental Pleadings Rule

15(d) Fed. R. Civ. Procedure (Dkt. 108.) The Court finds that the decisional process

would not be aided by oral argument. After reviewing the record, the arguments of the

parties, and the relevant case law, the Court enters the following Order addressing all

pending motions.

## PROCEDURAL BACKGROUND

Plaintiff commenced this civil rights action on July 16, 2010, alleging that certain

prison officials' conduct and the conditions of confinement at Idaho Correctional Center

(ICC) violated his rights guaranteed by the Eighth and Fourteenth constitutional

amendments and Title II, Section 504 of the Americans with Disabilities Act. (Dkt. 1.) In

the Court's Initial Review Order, Plaintiff was permitted to proceed only with his Eighth

Amendment claim against Defendants Corrections Corporation of America (CCA),

Rodriguez and Valdez (CCA Defendants) regarding the conditions of confinement at

ICC. (Dkt. 14, pp.8-10.) Plaintiff subsequently filed an Amended Complaint (Dkt. 20),

and in the Court's Initial Review of the Amended Complaint and Scheduling Order (Dkt.

47), Plaintiff was permitted to proceed with his Eighth Amendment claim against

Defendants Reinke and Corizon, Inc. for their alleged deliberate indifference to Plaintiff's

serious medical needs, and with his First Amendment retaliation claim against Defendant

Reinke for Plaintiff's out-of-state transfer to a facility in Oklahoma in July 2008 and his

September 2010 transfer from Idaho State Correctional Institution (ISCI) to ICC. (*Id.*,

pp.4-7, 10-11.) All other claims and defendants were dismissed.

**MEMORANDUM DECISION AND ORDER- 2**

During the discovery period in this case, Plaintiff was deposed by Defendants'
counsel on December 14, 2012. (Dkt. 91-6, p.2.) Plaintiff then filed two separate
affidavits with the Court regarding the manner in which the deposition was conducted and
identified some alleged technical errors that occurred in the taking of the deposition.
(Dkts. 82, 85.)

On February 20, 2013, CCA Defendants timely filed a Motion for Summary
Judgment (Dkt. 91), and on February 28, 2013, Defendants Corizon and Reinke each
timely filed their respective Motion for Summary Judgment as well. (Dkts. 95, 96.) All
three Motions for Summary Judgment have been fully briefed and were ripe as of April
11, 2013.

Two months later, on June 19, 2013, Plaintiff filed a Motion for Leave to File
Supplemental Pleadings Rule 15 Fed. R. Civ. Procedure (Dkt. 107) and a Motion for
Supplemental Pleadings Rule 15(d) Fed. R. Civ. Procedure (Dkt. 108). In these Motions
Plaintiff requests a stay of the proceedings in this case so that he can obtain additional
evidence that Defendants allegedly failed to disclose during discovery.

## PRELIMINARY MOTIONS

1.  **Plaintiff's Motion for Leave to File Affidavit (Dkt. 85) and CCA Defendants'
    Objection to Plaintiff's Motion for Leave to File Affidavit and Motion to
    Strike Affidavit (Dkt. 86)**

After Plaintiff was deposed on December 14, 2012, Plaintiff filed an Affidavit on
December 26, 2012 regarding the deposition and the three defense attorneys who
questioned him during the deposition. (Dkt. 82.) The next month, Plaintiff filed the

**MEMORANDUM DECISION AND ORDER- 3**

pending Motion for Leave to File Affidavit, and in the accompanying Affidavit Plaintiff describes the following errors or omissions related to the same deposition: (1) there is no audio file of the deposition available to Plaintiff; (2) Plaintiff did not receive a true and correct copy of the transcript; (3) the deposition was not properly concluded in accordance with Federal Rule of Civil Procedure 30(b)(5)(C); and (4) in two instances in the middle of the deposition, Attorney Stoll did not state "off the record," the time they went off the record, or "back on the record" when the deposition resumed. (Dkt. 85-1, pp.1-2.) Although Plaintiff points out these alleged technical errors, he does not state how he was prejudiced or otherwise harmed by them, nor does he inform the Court of what remedy he is seeking. Indeed, because "[t]here are no relevant pending motions to which the affidavits relate," CCA Defendants argue "there is simply no reason for the affidavits," so they object to Plaintiff's Motion for Leave to File Affidavit and request that the Court strike the December 26, 2012 Affidavit. (Dkt. 86, p.2.)[1]

Because the deposition at issue is relied upon in the pending Motions for Summary Judgment, the Court will grant Plaintiff's Motion for Leave to File Affidavit and deny CCA Defendants' Motion to Strike Affidavit. Nonetheless, the deposition transcript will remain part of the record and the Court will consider it when rendering its decision on the pending Motions for Summary Judgment. Plaintiff has complained about his deposition solely on technical grounds but has not shown how he was prejudiced or harmed thereby,

---

[1]The remaining Defendants Reinke and Corizon each filed Joinders to CCA Defendants' Objection to Plaintiff's Motion for Leave to File Affidavit and Motion to Strike Affidavit. *(See* Dkts. 87, 90.)

**MEMORANDUM DECISION AND ORDER- 4**

nor has he provided any legitimate reason why technical errors such as the ones he has delineated in his Affidavit "cannot be rectified in the absence of bona fide prejudice" to Plaintiff. *Pogue v. Woodford*, 2009 WL 2777768 *2 (E.D. Cal. 2009); *see also Lake's Unlimited, Inc. v. Allen*, 1997 WL 268453 *2 (9th Cir. 1997) (trial court properly admitted deposition transcript when petitioner objected to its inclusion solely on technical grounds). Thus his Affidavits will remain in the record, but so will the deposition transcript itself.

2.      **Plaintiff's Motion for Leave to File Supplemental Pleadings Rule 15 (Dkt. 107) and Motion for Supplemental Pleadings Rule 15(d) (Dkt. 108)**

Two months after the briefing was completed on the three Motions for Summary Judgment, Plaintiff filed a Motion for Leave to File Supplemental Pleadings Rule 15 Fed. R. Civ. Procedure (Dkt. 107) and a Motion for Supplemental Pleadings Rule 15(d) Fed. R. Civ. Procedure (Dkt. 108). In these Motions Plaintiff alleges that, because Defendants have failed to disclose "critical evidence" to him, he is entitled to a stay of the proceedings in this case so that he can obtain that evidence. The "critical evidence" Plaintiff requests is: (1) the so-called "Higgins Report", which is a letter prepared by an IDOC investigator dated August 7, 2008 and addressed to the Warden at ICC regarding an "initial analysis of violence at ICC"; and (2) evidence purportedly requested in another case pending before this Court regarding CCA being understaffed, CCA admitting to falsifying staffing reports, and CCA ceding too much power to the inmate gangs. (Dkt. 108, pp.1-2.) Defendants object to Plaintiff's Motions as being untimely and procedurally

**MEMORANDUM DECISION AND ORDER- 5**

and factually improper. (Dkts. 110, 111.)

Federal Rule 15(d) is used when a party seeks to supplement the pleadings to allege facts occurring after the original pleadings were filed. *See Cabrera v. City of Huntington Park*, 159 F.3d 374, 382 (9th Cir.1998) ("Rule 15(d) permits the filing of a supplemental pleading which introduces a cause of action not alleged in the original complaint and not in existence when the original complaint was filed.") (quotation omitted). Specifically, Federal Rule 15(d) provides as follows:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

Fed. R. Civ. P. 15(d). Thus, Rule 15(d) applies only to pleadings, which are the complaint, answer, reply and sur-reply. It is not the proper rule or procedure to request a stay of the proceedings, or to obtain evidence allegedly withheld during the discovery period. Accordingly, Plaintiff's Motion for Leave to File Supplemental Pleadings Rule 15 Fed. R. Civ. Procedure and Motion for Supplemental Pleadings Rule 15(d) Fed. R. Civ. Procedure will be denied to the extent Plaintiff has not filed any supplemental pleading with these Rule 15(d) Motions or made a request to do so.

Nonetheless, the Court will liberally construe Plaintiff's Rule 15(d) Motions as a singular Rule 16(b) motion to reopen discovery. In doing so, however, there are two competing alleged dilatory actions at issue: one is that Plaintiff was not diligent in timely

**MEMORANDUM DECISION AND ORDER- 6**

propounding any discovery requests upon Defendants that would have covered the

Higgins Report and similar evidence (*see* Dkt. 111-1, p.2); the other issue is that

Defendants did not produce to Plaintiff the Higgins Report and possibly other evidence

that may have fallen under their Rule 26 voluntary duty of disclosure. *See* Fed. R. Civ. P.

26(a)(1)(A). The Court also acknowledges that one of its primary goals is "to get cases

decided on the merits of issues that are truly meritorious and in dispute." *In re*

*Phenylpropanolamine (PPA) Prods. Liab.*, 460 F.3d 1217, 1227 (9th Cir. 2006).

      To balance the parties' interests and reduce the anticipated delay attendant with

Plaintiff's belated request, the Court will permit Plaintiff to submit and rely on the

Higgins Report to supplement his Response to the Defendants' Motions for Summary

Judgment, but will not permit him to conduct any other discovery, including Plaintiff's

vague reference that evidence being sought in another case regarding alleged

wrongdoings by CCA is relevant to this case. (*See* Dkt. 108, p.2.) An important factor in

the Court's decision is that, even assuming for the sake of argument that the Higgins

Report and other evidence put Defendants on notice of a substantial inmate-on-inmate

violence problem at ICC, Plaintiff still has not brought forward any facts upon which a

jury could find that the violence *caused* the injuries and damages of which Plaintiff

complains, namely an exacerbation of his PTSD symptoms. This lack of causation is

discussed further in the Court's analysis of Defendants' Motions for Summary Judgment

below. In summary, Plaintiff's Motion for Leave to File Supplemental Pleadings Rule 15

Fed. R. Civ. Procedure and Motion for Supplemental Pleadings Rule 15(d) Fed. R. Civ.

**MEMORANDUM DECISION AND ORDER- 7**

Procedure will be denied to the extent Plaintiff has not filed any supplemental pleading

with these Rule 15(d) Motions, but Plaintiff's request to submit the Higgins Report in

support of his response to Defendants' Motions for Summary Judgment will be granted.

## MOTIONS FOR SUMMARY JUDGMENT

Defendants have filed three separate Motions for Summary Judgment. (Dkts. 91,

95, 96.) The Court will set forth the governing standard of law as to all three motions,

followed by a separate analysis of each motion for summary judgment along with its

relevant undisputed facts and applicable law.

### 1. Standard of Law

#### A. Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the

summary judgment "is to isolate and dispose of factually unsupported claims . . . ."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment." *Anderson v.*

*Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). The requirement is that there be no

**MEMORANDUM DECISION AND ORDER- 8**

genuine dispute as to any *material* fact. "Material facts are those that may affect the outcome of the case." *See id.* at 248. The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv*., 809 F.2d at 630-31 (internal citation omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith*

**MEMORANDUM DECISION AND ORDER- 9**

*Radio Corp.*, 475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials– including the facts considered undisputed–show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

## B. Section 1983 Claims

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To have a claim under § 1983, a plaintiff must show the existence of four elements: "(1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).[2] Section 1983 is "'not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

An essential element of a § 1983 case is that the plaintiff show that the defendants'

---

[2]42 U.S.C. § 1983, provides, in pertinent part, as follows:
       Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State,  . . .  subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

**MEMORANDUM DECISION AND ORDER- 10**

actions caused the deprivation of a constitutional right. 42 U.S.C. § 1983; *Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). "The causation requirement of § 1983 . . . is not satisfied by a showing of mere causation in fact[;] [r]ather, the plaintiff must establish proximate or legal causation." *Id.* The Ninth Circuit has explained: "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivations of which he complains." *Id.* (internal citation omitted); *see also Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007).

## 2. CCA Defendants' Motion for Summary Judgment (Dkt. 91)

### A. Undisputed Facts

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not contradicted by clear documentary evidence in the record.

Plaintiff is an inmate in the custody of Idaho Department of Corrections (IDOC). Beginning April 7, 2000, Plaintiff was initially incarcerated at ISCI and then transferred to Idaho Maximum Security Institution (IMSI) on April 19, 2000. (Dkt. 91-11, p.2.) On January 5, 2001, Plaintiff was transferred to ICC, a private prison operated by CCA. Plaintiff resided there for over seven years until he was transferred to an out-of-state facility in Oklahoma on July 21, 2008. Prior to the transfer to the Oklahoma facility

(when Plaintiff was housed at ISCI, IMSI and ICC between April 2000 and July 2008), Plaintiff 's unit, block or bunk assignment was changed 12 times. (*Id.*) Plaintiff was transferred back to ISCI on April 20, 2009, and then transferred to ICC on September 14, 2010 where he currently resides. (*Id.*)

Prior to his incarceration, Plaintiff was diagnosed with Post-Traumatic Stress Disorder (PTSD) as a result of his military service in the Vietnam War. (Dkts. 92-4, p.41; 100-1, p.16.) PTSD is "an anxiety disorder that occurs after exposure to a traumatic event or series of events involving intense fear, helplessness or horror, such as combat exposure, child sexual or physical abuse, terrorist attack, sexual or physical assault, serious accident or natural disaster." (Khatain Decl., Dkt. 91-4, p.3.) PTSD symptoms include persistent re-experiencing (for example, recurrent flashbacks or nightmares), persistent avoidance of thoughts, feelings or conversations about the traumatic event, and increased arousal (for example, hyper-vigilance, exaggerated startle response, or outbursts of anger). One who suffers from PTSD may also exhibit self-destructive behavior, shame, despair, impaired relationships with others, and may also have an increased risk of panic disorders. (*Id.*, pp.3-4.) There are no primary physical injuries associated with PTSD; however, there are secondary physical problems that may be associated with PTSD, with the most common being headaches and gastrointestinal problems. (*Id.*, p.5.)

The two main categories of treatment of PTSD are therapy and medication. Many types of mental health professionals provide therapy for individuals with PTSD: clinical social workers, master's level clinicians, clinical psychologists, and psychiatrists. (*Id.*)

**MEMORANDUM DECISION AND ORDER- 12**

Plaintiff's claims against the CCA Defendants arise from his incarceration at ICC, which as set forth above, occurred between January 2001 to July 2008, and then from September 2010 until now. In his Complaint and Amended Complaint, Plaintiff alleges that the CCA Defendants are responsible for the "wholesale fear, intimidation, and violence within the prisoner population" at ICC, and that the violence, in turn, exacerbated his PTSD. (Dkt. 20, p.12.) Plaintiff further claims that Defendants Rodriguez and Valdez fostered the violent conditions at ICC, and that the following ICC policies further account for the violent and degrading conditions: inadequate training, supervision and number of staff; failure to adequately investigate acts of violence; failure to discipline guards for misconduct; failure to properly discipline prisoners who attack other prisoners; staff maintaining a "code of silence;" encouragement of prisoner violence as a management tool; and a general promotion of a culture of degradation and humiliation. (Dkt. 1, p.4.)

Regarding the alleged violence at ICC, Plaintiff admits that he was involved "in one fight in 2003 that was unavoidable" but other than that incident, he has never been attacked at ICC. (Dkt. 91-7, p.17). When asked about the alleged policies that furthered the violent and degrading conditions at ICC, the only policy Plaintiff identified in his deposition is an allegation in another lawsuit that Defendant Valdez "put sex offenders in the same cell with the documented violent inmates." (*Id.*, p.41.) When counsel asked Plaintiff to be more specific about the policies enacted at ICC that fostered violence, Plaintiff repeatedly said he was "not an informant" and if he provided names of inmates

**MEMORANDUM DECISION AND ORDER- 13**

injured as a result of the policies, "that puts my life in danger." (*Id.*, pp.41-42.)

As to Plaintiff's PTSD, a number of mental health professionals have treated Plaintiff for this disorder during his incarceration at ICC. Dr. Khatain, the ICC psychiatrist, provides the overall direction, coordination and leadership for the mental health services at ICC. He routinely assesses and provides a DSM[3] diagnosis for inmates and prescribes and monitors psychotropic medications. (Dkt. 91-4, p.3.)

The CCA also employs two Mental Health Coordinators (MHC) at ICC who plan the professional mental health service programs and coordinate the activities of personnel engaged in providing mental health services to inmates.[4] (Dkt. 91-5, p.2.) The MHC is the point of contact for all inmate concerns and issues regarding their mental health, including medication, treatment, symptom identification and control, and prevention of behavioral escalation. (*Id.*) The MHC also serves as a clinician who identifies and responds to mental health symptoms presented by an inmate, recommends a course of treatment, and acts as an advocate for an inmate regarding his mental health. (*Id.*). The MHC works closely with the ICC psychiatrist, Dr. Khatain, and IDOC's chief psychologist, Dr. Craig. Dr. Reed was a prior ICC psychologist and his name appears throughout Plaintiff's mental health records. (*Id.*, p.3.)

---

[3]DSM refers to the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association. This manual provides the nomenclature and standard criteria for the classification of mental disorders. (Dkt. 91-4, p.3.)

[4]The current MHCs are Trent Gray and Alexander Black. Prior MHCs have included W.L. Maddox, and A.J. Lee, whose names appear throughout Plaintiff's mental health records. (Dkt. 91-5, p.2.)

**MEMORANDUM DECISION AND ORDER- 14**

ICC coordinates its mental health services with mental health staff and prison management to assist those with PTSD symptoms, including mental health supervisors, the in-house psychiatrist, and correctional and case management staff. (*Id.*, p.4.) ICC mental health staff work with inmates on self-help strategies and methods of using cognitive behavioral therapy approaches, and they provide brief crisis counseling with individuals experiencing acute PTSD symptoms. MHCs facilitate a "process of recovery" class that uses cognitive behavioral methods to teach inmates a variety of self-help coping and adjustment skills for a variety of anxiety and stress disorders, including PTSD. (*Id.*) In addition, ICC makes referrals for inmates with acute PTSD symptoms to the Behavioral Health Unit (BHU) 16 House at ISCI if it appears the inmate is experiencing extreme anxiety, panic attacks, night-terrors, etc. (Dkt. 103-2, p.5.) The BHU provides more intensive, regular and specific treatment interventions with therapists as well as forms of group therapy and support groups. (*Id.)*

Plaintiff's ICC medical records include the following mental health requests that Plaintiff submitted, the basis for their submissions, and the treatment options that were offered or provided to Plaintiff by various ICC mental health staff members:

(1) In 2001, Plaintiff submitted eight Health Services Request (HSR) forms, and in seven of these HSRs he requested to see "a psychiatrist or psychologist", or he specifically requested to see Dr. Reed, the ICC psychologist at the time. Plaintiff was seen by a psychologist in response to each of those HSRs, and Plaintiff's mental health records indicate he discussed a variety of topics with the psychologist, including his

**MEMORANDUM DECISION AND ORDER- 15**

PTSD in general and his refusal to see a psychiatrist or consider medication, his "multiple lawsuits and anger at Mormons" (Dkt. 92-1, p.19), mail delivery (Dkt. 92-1, p.18), his issues with an inmate (Dkt. 92-4, p.69), his "legal case only" (Dkt. 92-1, p.26), his "legal case . . . [and] brief history of why he went to trial . . . PTSD from Vietnam and future goals if awarded money" (Dkt. 92-1, p.32), a letter from Plaintiff's brother (Dkt. 92-1, p.29), Plaintiff's "difficulty in living in pod with roommates," and a request for protective custody. (Dkt. 92-1, p.31.) The only 2001 HSR not responded to by a psychologist is dated September 19, 2001, wherein Plaintiff stated "doctor-patient-confidentiality" as his concern; but when a nurse at sick call attempted to meet with Plaintiff on September 21, 2001, he refused to be seen by the nurse. (Dkt. 92-1, p.27.)

(2) In 2002, Plaintiff submitted four HSRs regarding his PTSD. MHC Maddox responded to each of these HSR submissions in writing as follows: on April 29, 2002, he noted "currently there is no PTSD therapy group" but "several psychotropic meds are available to treat PTSD" (Dkt. 92-1, p.40); on August 26, 2002, he wrote that Plaintiff's request for his medical records pertaining to PTSD would be handled through Health Services Administration (HSA) (Dkt. 92-1, p.41); on September 16, 2002, he noted that he would schedule Plaintiff an appointment with Psychiatrist Dr. Khatain to discuss Plaintiff's "PTSD and psychological torture in IDOC system" (Dkt. 92-1, p.44); and on October 29, 2002, MHC Maddox indicated he would schedule Plaintiff to have another psychiatry appointment with Dr. Khatain. Plaintiff met with Dr. Khatain in August, September, and November 2002. (Dkts. 92-1, pp.46-47; 92-4, p.25; 92-1, p.48.) At each

**MEMORANDUM DECISION AND ORDER- 16**

of these appointments, Dr. Khatain discussed Plaintiff's PTSD and the benefits of psychotropic medications, but each time Plaintiff refused to take any medication. In addition, Plaintiff stated that he "does not trust the sytem" (Dkt. 92-1, p.47) and that he "feels he's doing OK and doesn't want any [meds]." (Dkt. 92-1, p.48.)

(3) Plaintiff submitted two HSRs in 2003: on April 11, 2003, Plaintiff requested "treatment for PTSD service-connected USMC", and MHC Maddox noted that "images of war on TV are bringing back [Plaintiff's] PTSD, needs psych. appt." (Dkt. 92-4, p.55); and on December 2, 2003, Plaintiff requested an appointment with "Dr. Maddox" but MHC Maddox noted "anxiety/depression, patient reports PTSD - refuses psych appt." (Dkt. 92, p.10.) Nurse Stephens also visited Plaintiff in his segregation cell on December 3, 2003, as a follow up to his December 2, 2003 HSR. (Dkt. 92-1, p.55) Plaintiff "stated he was unhappy with psychology and psychiatry services ... that he now knew that Mr. Maddox was not a psychologist, [and] Dr. Khatain 'just issued pills' and did nothing else to help him." (*Id.*) Plaintiff did agree, however, to be seen by Dr. Khatain again in the future. (*Id.*)

Plaintiff met with Dr. Khatain on two different occasions in 2003: on May 17, 2003, Dr. Khatain's Clinic Notes indicate Plaintiff "had no interest in meds" and that the "recent war and subsequent reported placement of a 'black muslim' in my cell have made my PTSD worse" (Dkt. 92-1, p.54); and on December 28, 2003, Dr. Khatain's Clinic Notes state that Plaintiff "wanted me to document that he has never received treatment for his mental issues, that the MH therapists were not psychologists and were actually only . .

**MEMORANDUM DECISION AND ORDER- 17**

. clinicians. [Dr. Khatain] explained that these individuals were still here to help him if he chose to accept that help . . . [Plaintiff] acknowledged he continues with nightmares and other classic PTSD symptoms but he was doing fine without meds and didn't want to try any." (Dkt. 92-1, pp.55-56.)

(4) In 2004, Plaintiff submitted an HSR on March 14, 2004 "requesting appointment to see outside psychologist at chapel" but MHC Maddox's follow-up notes indicate this request was a misunderstanding. (Dkt. 92-4, p.54.) Plaintiff's only other mental health request in 2004 was on August 16, 2004, wherein he requested an appointment with Dr. Khatain. (Dkt. 92-4, p.50.) Dr. Khatain met with Plaintiff on August 28, 2004, and his Clinic Notes indicate Plaintiff "only wants me to document that [he has] PTSD and that [he's] not being allowed to see a psychologist to get the treatment [he] need[s]." (Dkt. 92-1, p.63.) Dr. Khatain further noted Plaintiff expressed no willingness to consider meds, so he then concluded: "Please do not send this pt. back to me again, unless he specifically agrees to try med(s). Otherwise his visits with me are only reinforcing his sense that I am somehow 'helping him' by writing down his complaints, etc." (*Id.*)

(5) In 2005, Plaintiff submitted only two HSRs (both in January), and each time he requested an appointment with a psychologist, not a psychiatrist or clinician. In response to the January 2, 2005 HSR, MHC Lee met with Plaintiff on January 3, 2005 and Plaintiff refused to talk to him (Dkt. 92-4, p.49). As to Plaintiff's second HSR dated January 28, 2005, a nurse noted that Plaintiff was "to see Dr. Khatain." (Dkt. 92-4, p.40.) On

**MEMORANDUM DECISION AND ORDER- 18**

February 6, 2005, a nurse's Clinic Notes indicate Plaintiff came to obtain a referral to an outside psychologist but the psychiatrist informed Plaintiff he is not able to write an outside referral. Plaintiff said he "is planning to sue the facility" and left medical. (Dkt. 92-4, p.20.)

(6) In 2006, Plaintiff submitted just one HSR on November 1, 2006, "requesting appointment to see psychologist not psychiatrist." (Dkt. 92-4, p.38.) Plaintiff was seen in medical and referred to mental health, but on November 10, 2006, Plaintiff signed a refusal of treatment for a mental health visit. (Dkt. 92-3, p.68.)

(7) In 2007, Plaintiff submitted one HSR on August 16, 2007 "requesting the cost of appointment to confer with psychologist from private practice" and in response he was scheduled for a medical callout (Dkt. 92-2, p.9.) But on August 20, 2007 Plaintiff signed a refusal of treatment for the referral. (Dkt. 92-3, p.66.) A Comprehensive Mental Health Evaluation dated December 23, 2007 noted the following about Plaintiff: "PTSD, no meds/states handling." (Dkt. 92, p.8.)

(8) On January 8, 2008, Plaintiff submitted an HSR complaining of an "ulcer" and the nurse's documentation says "see protocol." (Dkt. 92-2, p.16.) The corresponding protocol sheet notes that Plaintiff complained of emesis and indigestion on January 18, 2008. He was given pepto and told to return "if more emesis." (*Id*., p.15.) As previously noted, Plaintiff was transferred from ICC to another facility in Oklahoma on July 21, 2008, and then back to ISCI on April 20, 2009.

(9) When Plaintiff was transferred back to ICC on September 14, 2010, a

**MEMORANDUM DECISION AND ORDER- 19**

Comprehensive Mental Health Evaluation was conducted and the MHC noted that Plaintiff "appears functional and well" and no action was taken. (Dkt. 92, p.6.) Plaintiff then submitted two HSRs in October, both of which requested an "appointment with psychologist-PhD". (Dkt. 92-2, pp.35,38.) MHC Black interviewed Plaintiff and noted that Plaintiff was "hostile and uncooperative" and "resistive to talking with me." (Dkts. 92-2, p.35; 92-5, p.8.) MHC Black also noted that Plaintiff insisted that only a psychologist could help him and after re-informing Plaintiff about the mental health services at ICC, Plaintiff "again refused to participate in any assessment to ascertain his symptom severity which would allow for plan development." (Dkt. 92-5, p.8.)

(10) On June 14, 2011, the same day Plaintiff filed his Amended Complaint, he submitted an HSR complaining of heart palpitations. (Dkt. 92-2, p.53.) The nurse's Progress Notes state Plaintiff complained of "coercion" to go to TC or DEF and was very upset about this, but he had no symptoms of acute distress. (Dkt. 92-2, p.57.)

### B. Analysis

Plaintiff has alleged that CCA Defendants are liable for incarcerating Plaintiff at ICC in conditions that are excessively violent and degrading, which aggravated Plaintiff's PTSD symptoms in violation of the Eighth Amendment. To prevail on this conditions of confinement claim, Plaintiff must meet both an objective and subjective requirement. Plaintiff satisfies the objective requirement by showing that he is incarcerated under conditions posing a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Second, the prison official must have a sufficiently culpable state of mind.

**MEMORANDUM DECISION AND ORDER- 20**

*Id.* Plaintiff must show that the defendants were deliberately indifferent to the substantial risk of harm, which is established by showing that an official knows of and disregards a condition posing a substantial risk of harm, or that the official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws the inference. *Id.* at 837.

CCA Defendants argue that summary judgment is appropriate because Plaintiff has failed to establish that any of the materials facts regarding his claim are in dispute, nor has he produced any admissible evidence to adequately support his claim. Specifically, CCA Defendants argue that Plaintiff has failed to show that he was incarcerated under conditions posing a substantial risk of serious harm, that CCA had a policy or custom amounting to deliberate indifference which caused Plaintiff's alleged deprivation, that Defendants Valdez or Rodriguez were personally deliberate indifferent to Plaintiff's safety, or that Plaintiff suffered any physical injury.

Having thoroughly reviewed the parties' arguments and the evidence presented herein, the Court finds Plaintiff has failed to adequately support his conclusory allegation that violent conditions at ICC caused physical injury to Plaintiff. As set forth below, Plaintiff has failed to satisfy the objective prong of the *Farmer* test – showing that he was incarcerated under conditions posing a substantial risk of serious harm – so summary judgment is appropriate, especially when CCA Defendants' objective evidence shows otherwise. *Gonzales v. Carillo*, 2013 WL 1700964 *8 (C.D. Cal. 2013) (despite plaintiff's subjective fear of imminent harm, defendant's motion for summary judgment was granted

**MEMORANDUM DECISION AND ORDER- 21**

when plaintiff failed to set forth specific facts or evidence demonstrating the existence of a triable issue that he was subject to an objectively substantial risk of harm while in the general population); *Soto v. Felker*, 265 F. App'x 605, 606 (9th Cir. 2008) (district court's grant of summary judgment was proper because appellant's conclusory allegations regarding his Eighth Amendment claim were insufficient to controvert defendants' evidence); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data).

The undisputed evidence in the record shows that while incarcerated at ICC, Plaintiff filed numerous HSR Forms specifically requesting to see a "PhD psychologist" for his PTSD. In response to each of the HSR Forms Plaintiff submitted, an ICC mental health or medical professional (including, on occasion, the ICC psychologist) met with, counseled, treated, or attempted to treat Plaintiff's PTSD symptoms of which he routinely complained. CCA Defendants have provided the Court with Plaintiff's voluminous ICC medical record, which includes these various mental health and medical professionals' notes and summaries of their visits and conversations with Plaintiff regarding the counseling, treatment, or attempted treatment of Plaintiff's PTSD. In all of Plaintiff's HSRs and his ICC medical record, however, there is not a single contemporaneous complaint or comment about the <u>violence</u> at ICC – either the overall condition of violence at ICC or any specific violent attacks upon or attempted at Plaintiff  – and how that aggravated or exacerbated Plaintiff's PTSD symptoms. Rather, Plaintiff complained of

**MEMORANDUM DECISION AND ORDER- 22**

such things as his black muslim cellmate, the mail delivery, his ongoing and anticipated litigation matters, and the war images on TV.

Plaintiff maintains that he repeatedly told the ICC mental health and medical staff that the violent conditions affected his PTSD (*see, e.g.,* Dkt. 91-7, pp.16-27) but when asked in his deposition why his medical records do not contain a single reference to the violent or dangerous conditions aggravating Plaintiff's PTSD symptoms, Plaintiff stated that "CCA is notorious for being corrupt and incompetent" and "[CCA has] two sets of books." (Dkt. 91-7, pp.21-22.) Plaintiff's conclusory statements about CCA's overall corruption and duplicitous bookkeeping, however, is unsupported by any evidence in the record. Even if this were true, not one of Plaintiff's own HSR forms mentions the violent or dangerous conditions at ICC as the basis for his aggravated PTSD symptoms, and Plaintiff has not provided the Court with any explanation whatsoever for this significant omission.

Similarly, Plaintiff was repeatedly asked in his deposition to describe specific incidents of violence at ICC that aggravated his PTSD between January 2001 and July 2008, and from September 2010 through the present; he could not. Plaintiff was involved in one fight in 2003 for which he was issued a Disciplinary Offense Report, but other than that, Plaintiff admits that he has never been attacked at ICC. (Dkt. 91-7, p.17.)

In summary, "Plaintiff's claim that he was forced to endure a 'constant threat of violence' is too general and conclusory to make the objective showing required on an Eighth Amendment claim." *Funk v. Schriro*, 2009 WL 4898262 *7 (D. Ariz. 2009)

**MEMORANDUM DECISION AND ORDER- 23**

(district court granted summary judgment because Plaintiff failed to present specific facts or evidence demonstrating that his placement in a certain prison unit exposed him to an objectively intolerable risk of harm); *Guillen v. Thompson*, 2008 WL 5331915 *9 (D. Ariz. 2008) (dismissing case for failure to state a claim where plaintiff makes only conclusory and speculative assertions that his safety is threatened and fails to set forth facts to support claim that he is incarcerated in conditions that pose a substantial risk of harm or that Defendants acted with deliberate indifference to such risk). Because Plaintiff cannot satisfy the objective requirement of the *Farmer* test, the Court need not address whether a genuine issue of material fact exists as to subjective requirement in *Farmer* and whether the CCA Defendants were deliberately indifferent to Plaintiff's substantial risk of serious harm.

Moreover, for Plaintiff to reach a jury trial on his Eighth Amendment claim against the CCA entity, and Defendants Valdez and Rodriguez in their official capacities, the Court previously informed Plaintiff that he must bring forth sufficient evidence to show he could satisfy the requirements set forth in *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 691-94 (1978). That is, Plaintiff must show: (1) he was deprived of a constitutional right; (2) CCA had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. Furthermore, "liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency, and consistency that the conduct

**MEMORANDUM DECISION AND ORDER- 24**

has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citations omitted).

Although the Court has already determined that Plaintiff has failed to establish a deprivation of a constitutional right, Plaintiff's claim against the CCA Defendants would likewise be denied for failing to establish that ICC had any policy or custom that amounted to deliberate indifference to Plaintiff's constitutional right or that it was the moving force behind a constitutional violation. Plaintiff has not supported the vague allegations in his Complaint that ICC has policies encouraging prisoner violence as a management tool, promoting a culture of degradation and humiliation at ICC or having the staff maintain a "code of silence." Nor has Plaintiff established that ICC has a custom or policy of failing to train, supervise and maintain an adequate staff, discipline its guards for misconduct or discipline other prisoners for attacking other prisoners. (*See* Dkt. 1, p.4.)

When defense counsel asked Plaintiff in his deposition about the alleged policies that furthered the violent and degrading conditions at ICC, the only policy Plaintiff identified is an allegation made in another lawsuit that Defendant Valdez "put sex offenders in the same cell with the documented violent inmates." (Dkt. 91-7, p.41.) When counsel asked Plaintiff to be more specific about the policies enacted at ICC that fostered violence, Plaintiff repeatedly said he was "not an informant" and if he provided names of inmates injured as a result of the violent-based policies, "that puts my life in danger." (*Id.*, pp.41-42.) Plaintiff had another opportunity to establish his claim that ICC enacted

**MEMORANDUM DECISION AND ORDER- 25**

policies that fostered the violence which purportedly exacerbated his PTSD when he responded to CCA Defendants' Motion for Summary Judgment. Rather than providing admissible evidence (or citing to materials already in the record) showing that such policies existed and were the "moving force" behind his constitutional deprivation, Plaintiff referred once again to allegations made in another lawsuit against Defendant Rodriguez that is pending before this Court. (Dkt. 100, p.2.) Such a reference is both improper and insufficient to create a triable issue of fact in this case, which is centered on how the alleged violence caused him personal injury and harm.[5]

Plaintiff's allegations of ICC's violence-based policies and how such policies caused his alleged constitutional deprivation are unsupported by the record herein; he has failed to produce admissible evidence to support his policy-based claim of deliberate indifference in violation of his Eighth Amendment right. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.") For all of the foregoing reasons, the Court will grant CCA Defendants' Motion for Summary Judgment.

## 3. Defendant Corizon Inc.'s Motion for Summary Judgment (Dkt. 95)

### A. Undisputed Facts

---

[5] Because Plaintiff has failed to show a causal link between any violence at ICC and his alleged injuries and he is not entitled to proceed to a jury trial for that reason, the Court declines to address CCA Defendants' alternative argument that Plaintiff's claim is barred by 42 U.S.C. Section 1997e(e) and its "physical injury" requirement. *(See* Dkt. 91-2, pp.16-20.)

**MEMORANDUM DECISION AND ORDER- 26**

Plaintiff alleges that Defendant Corizon provided constitutionally inadequate psychological treatment while he was housed at ISCI between April 2009 and September 2010. Corizon is the contracted provider of health care services to inmates at IDOC facilities, including ISCI. (Dkt. 95-15, p.2.) Corizon itself does not provide medical care or mental health treatment to inmates; rather, it contracts with physicians and other health care providers to provide such care and treatment to inmates as independent contractors. (*Id.*) These health care providers determine the appropriate medical care or mental health treatment on a case-by-case basis based upon their education, training and experience and after considering the patient's presentation, clinical findings, and medical history. (*Id.*)

On April 20, 2009, when Plaintiff was transferred to ISCI, Plaintiff underwent an intake mental health screening provided by one of Corizon's contracted social workers. (Dkt. 95-7, p.20.) The social worker who conducted the screening noted that Plaintiff had a history of "chronic PTSD," had current complaints of insomnia and irritability, and that Plaintiff did not take any psychotropic medications. The screening also reflected that only a routine mental health follow up by a clinician was needed, and that Plaintiff could be housed in the general population. (*Id.*)

While incarcerated at ISCI, Plaintiff did not file any HSR forms related to his psychological care or PTSD condition. Plaintiff only filed one Offender Concern Form with Deputy Warden of Operations – Shell Wamble-Fisher – on April 9, 2010, requesting an appointment with a psychologist, "due to my V.A. rating continues at permanent and total-service connected." (Dkt. 95-4, p.14.) Deputy Warden Wamble-Fisher responded to

**MEMORANDUM DECISION AND ORDER- 27**

the Concern Form by informing Plaintiff if he wanted an appointment with a psychologist

at the Veterans Administration, it was his responsibility to make one. Plaintiff did not

appeal the Deputy Warden's response by filing a Grievance Form, nor did he file any

other Grievance Forms while housed at ISCI. (Dkt. 95-9, p.5.) On September 14, 2010,

Plaintiff was transferred from ISCI back to ICC. (Dkt. 95-14, p.2.)

### B. Analysis

Defendant Corizon argues it is entitled to summary judgment regarding Plaintiff's

claim of deliberate indifference because Plaintiff has failed to "demonstrate the care and

treatment provided to him was constitutionally inadequate, and he has failed to exhaust

his administrative remedies." (Dkt. 95-1, p.2.)

Plaintiff's Eighth Amendment claim against Corizon for the alleged inadequate

mental health care he received while housed at ISCI is subject to the same objective and

subjective requirements set forth in *Farmer*. Plaintiff must meet the objective requirement

of the *Farmer* test by showing the existence of a serious medical need; then Plaintiff must

satisfy the subjective requirement by showing that prison officials' "acts or omissions

[were] sufficiently harmful to evidence deliberate indifference to [those] serious medical

needs." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citing *Estelle v. Gamble*, 429 U.S.

97, 103-04 (1976)). The Supreme Court has opined that "[b]ecause society does not

expect that prisoners will have unqualified access to health care, deliberate indifference to

medical needs amounts to an Eighth Amendment violation only if those needs are

'serious.'" *Id.*

**MEMORANDUM DECISION AND ORDER- 28**

The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain; . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Additionally, the Eighth Amendment does not provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). If the defendants are able to show that medical personnel have been "consistently responsive to [the inmate's] medical needs, and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," a plaintiff's claims may be dismissed by summary judgment prior to trial. *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

To begin with, Corizon is the contracted health care provider for inmates at IDOC facilities, including ISCI. (Dkt. 95-15, p.2.) Being an entity and not an individual,

**MEMORANDUM DECISION AND ORDER- 29**

Corizon itself does not provide mental health treatment to inmates, including Plaintiff. Rather, Corizon contracts with individual physicians and other health care providers to provide such care and treatment. (*Id.*) Accordingly, Plaintiff must satisfy the *Monell* standard set forth above to prevail on his Eighth Amendment claim against Corizon, which in short requires Plaintiff to establish that he was deprived of a constitutional right, and that Corizon had a policy or custom that was deliberately indifferent to, and the moving force behind, the constitutional violation. *Monell*, 436 U.S. at 691-94. In the Initial Review Order, however, the Court ruled that Plaintiff must first survive summary judgment regarding the alleged constitutional violation – that Corizon contract workers were deliberately indifferent to his serious medical needs – before Plaintiff would be permitted to further pursue and satisfy the policy-based elements of his claim. (Dkt. 47, p.8.) In other words, if Plaintiff was provided with constitutionally adequate mental health care by Corizon contract workers, then it is obvious that a Corizon policy did not cause a constitutional violation. For the reasons set forth below, the Court finds that Plaintiff has not sufficiently established that Corizon provided constitutionally inadequate medical care to Plaintiff; Corizon's Motion for Summary Judgment therefore will be granted.

A convicted prisoner is entitled to psychological or psychiatric care for serious mental or emotional illness; there is no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979). In addition, other

**MEMORANDUM DECISION AND ORDER- 30**

courts in the Ninth Circuit have held that PTSD constitutes a serious medical condition. *Dillman v. Tuolumne Co.*, 2013 WL 1907379 *11 (E.D. Cal. 2013) (*citing Bloodworth v. Krall*, 2011 WL 1043726 *4 (S.D. Cal. 2011)). Accordingly, although Plaintiff's PTSD may be considered a serious medical condition and thus satisfy the objective requirement of the *Farmer* test, Plaintiff must also show that Corizon was deliberately indifferent to this serious medical condition. Plaintiff has not established how any of Corizon's contracted health care providers failed to provide adequate mental health care to him while he was housed at ISCI, or how Plaintiff was injured thereby. Neither party has produced much evidence regarding the mental health care or treatment Plaintiff did or did not receive at ISCI, but after a review of what evidence there is, the Court finds it is insufficient to create a triable issue of fact as to Corizon's deliberate indifference.

When Plaintiff was transferred to ISCI on April 20, 2009, he underwent a comprehensive mental health screening. (Dkts. 95-15, p.3; 95-17, p.2.) The social worker who conducted the screening noted that Plaintiff had a history of PTSD, that Plaintiff was not taking any psychotropic medication, and that he currently complained of insomnia and irritability. (Dkt. 95-17, p.2.) The social worker further noted that a "routine mental health follow up" could be done by a clinician (*see id.*), but there was nothing on the screening form that indicated it would be necessary for Plaintiff to meet with a psychologist or psychiatrist to monitor and treat his PTSD. (Dkt. 95-15, p.3.)

On July 9, 2009, the Deputy Warden of Operations, Shell Wamble-Fisher, sent a memo to Plaintiff wherein she indicated she "received [Plaintiff's] information on [his]

**MEMORANDUM DECISION AND ORDER- 31**

disability" and stated that the criteria for being housed in IDOC's Behavioral Health Unit depends on the level of mental health needs of the offender. She then told Plaintiff: "I will have a clinician do a mental health assessment for you and make recommendations for your treatment. Should the assessment indicate your need to be placed in BHU, the clinician can make a referral; and placement will be determined at that time." (Dkt. 102-1, p.1.)

Plaintiff argues that an assessment was never done, and that he filed HSRs in response to Deputy Warden's memo but they "were ignored." (Dkt. 102, p.2.) Plaintiff also contends that he was required to submit both copies of the HSR form, so he does not have a copy of any of the HSRs he submitted to ISCI. (*Id.*; Dkt. 91-7, pp.45-46.) Corizon has not submitted any medical records for Plaintiff, and maintains that Plaintiff did not file any HSRs while housed at ISCI. (*See* Dkt. 95-1, p.12.) Plaintiff has not specified what he complained of in the HSRs, or how he was harmed by the health care providers' alleged refusal to respond to the HSRs. When there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," a plaintiff's claims may be dismissed by summary judgment prior to trial. *Toguchi,* 391 F.3d at 1061.

The only other evidence related to Plaintiff's claim against Corizon is an Offender Concern Form Plaintiff filed with the Deputy Warden Wamble-Fisher on April 9, 2010 wherein he wrote: "I inadvertently met the (clinician) last week on Unit 24. He informed me he was not a psychologist. I'm requesting an appointment with psychologist, due to

my V.A. rating continues at permanent and total-service connected." (Dkt. 95-4, p.14.)
The Deputy Warden apparently interpreted Plaintiff's request as wanting an appointment
with a VA psychologist, because she responded to Plaintiff as follows: "It is your
responsibility to contact the VA. They will need to contact the IDOC for approval to send
their psychologist." (*Id.*) Plaintiff did not appeal Deputy Warden Wamble-Fisher's
response, and his apparent unwillingness to meet with a clinician demonstrates his
continuing refusal to accept the routine initial care offered to inmates with mental health
issues. Moreover, the psychologist at Idaho Maximum Security Institution, who reviewed
ISCI's care and treatment of Plaintiff, opined that "it was reasonably and medically
appropriate to offer [Plaintiff] specialized group treatment for veterans with PTSD
through clinicians and the staff of the Veterans Administration." (Dkts. 95-9, p.5; 95-15,
p.3.)

        In addition, although Plaintiff contacted Deputy Warden Wamble-Fisher two
different times about his PTSD, there is no evidence in the record that Deputy Warden
Wamble-Fisher ever put Corizon's contracted health care providers on notice that
Plaintiff should be assessed for possible placement into BHU, or that he requested to see a
psychologist. There can be no deliberate indifference by Corizon's contracted health care
providers if they did not know of Plaintiff's needs.

        Lastly, the Court agrees with Corizon's final argument that dismissal of Plaintiff's
claim is warranted because Plaintiff failed to exhaust his administrative remedies. (Dkt.
95-1, pp.12-14.) An inmate must exhaust his administrative remedies before he can

pursue a claim in federal court. *Woodford v. Ngo*, 548 U.S. 81, 88, (2006). Corizon submitted an Affidavit from the ISCI Grievance Coordinator who describes the administrative grievance process for resolving an inmate's health care complaints. (Dkt. 95-9.) In essence, the inmate must first seek an informal resolution to the matter by filing an Offender Concern Form with the staff person most directly involved with the inmate's problem. (*Id.*, p.3.) If an informal resolution is not accomplished, then the inmate must complete a Grievance Form and in the case of a medical issue, file it with medical staff who prepares a response that is then reviewed by the Health Services Administrator. (*Id.*, pp.3-4.) If the inmate is not satisfied with the response to his grievance, he may appeal the response to the grievance. For medical grievances, the appeal is forwarded to the Regional Manager or Vice President of IDOC's medical contractor. (*Id.*) The administrative grievance process is exhausted upon completion of all three steps. (*Id.*)

The Grievance Coordinator reviewed ISCI's database for grievances and determined Plaintiff did not file a single grievance while housed at ISCI; he did not file a grievance or appeal the Deputy Warden's response to his April 9, 2010 Concern Form, nor did he file any other Grievance Forms while housed at ISCI. (Dkt. 95-9, p.5.) Plaintiff has not refuted any of the evidence showing that he failed to exhaust his administrative remedies. Accordingly, these undisputed facts provide an additional basis for dismissal of Plaintiff's claim against Corizon.

In summary, Corizon's Motion for Summary Judgment will be granted for Plaintiff's failure to show that Corizon's contracted health care providers were

**MEMORANDUM DECISION AND ORDER- 34**

deliberately indifferent to Plaintiff's PTSD, and his failure to exhaust his administrative remedies.

**4. Defendant Reinke's Motion for Summary Judgment (Dkt. 96)**

**A. Undisputed Facts**

In the Amended Complaint, Plaintiff alleges that Defendant Reinke was deliberately indifferent to his serious medical needs, and that Defendant Reinke retaliated against Plaintiff for filing a grievance and this lawsuit by improperly reclassifying him and transferring him to other facilities. (Dkt. 20, pp. 3,11-12.) These allegations refer to the time periods Plaintiff was incarcerated at ICC and ISCI– between January 2001 and July 2008, and from April 2009 until now.

Defendant Reinke is the Director of IDOC, a position he has held since January 1, 2007. (Dkt. 96-3, p.1.) As the Director of IDOC, Defendant Reinke oversees the overall operations of IDOC and has very little personal contact with individual inmates. (*Id.,* p.2.) Defendant Reinke has never met Plaintiff, nor has he received any Concern Forms or Grievances filed by Plaintiff. (*Id.*) Defendant Reinke is not involved in the day-to-day operations of any IDOC facility or ICC, and he is not involved in the medical care of any IDOC inmate. He was never involved with the medical care provided to Plantiff during his incarceration at ICC and ISCI. (*Id.*) Defendant Reinke is not involved in the reclassification of inmates, nor is he involved in the decisions to transfer inmates from one facility to another; he had no involvement in Plaintiff's transfers to an Oklahoma facility on July 21, 2008, or in Plaintiff's transfer from ISCI to ICC on September 14,

**MEMORANDUM DECISION AND ORDER- 35**

2010, and he was not involved in Plaintiff's reclassification in April 2010. (*Id.*, pp.3-4.)

IDOC Standard Operating Procedures (SOP) provide the policies and procedures related to the classification/reclassification and placement of offenders as well as the custody level each inmate is assigned. (Dkt. 96-4, p.2.) Inmates are generally reclassified on an annual basis and a number of factors are used to compute the classification/reclassification score, including the severity of the inmate's offense, his institutional behavior and his parole and release dates. (*Id.*, pp.2-3.) The legitimate penological goals of the classification system include maintaining safety, security and order at IDOC facilities, meeting the needs of offenders such as programming and vocational work opportunities, and protecting the public. (Dkt. 96-5, p.4.) Plaintiff's April 2010 Reclassification Score Sheet shows that he was reclassified at a medium custody level in accordance with IDOC policies. (Dkts. 96-4, p.4; 96-8, p.2.)

Further, an inmate's placement within IDOC is based on his classification/custody level, IDOC Offender Placement Matrix requirements, pathways and release date, IDOC needs, and the need to maintain safe levels of populations at the institutions. (Dkt. 96-5, p.26.) Placement changes or inmate transfers generally occur for one of four reasons: (1) Case Plan Requirement - based on the inmates' case plans and treatment needs; (2) Security Requirements - based on a security need or classification; (3) Medical Requirement - based on a medical/mental health need or consideration; and (4) Departmental Requirement - based on a need to fill a vacant bed or facilitate efficient placement of inmates within IDOC. (*Id.*, p.27.) Similar to the goals of the IDOC

**MEMORANDUM DECISION AND ORDER- 36**

classification system, each of these reasons promotes a legitimate penological goal –

meeting the inmates' needs, maintaining safety, security and order at IDOC facilities, and

protecting the public.

### B. Analysis

Plaintiff alleges Defendant Reinke violated his Eighth Amendment rights because

he was deliberately indifferent to Plaintiff's serious medical needs while incarcerated at

ICC and ISCI, and he also violated Plaintiff's First Amendment rights when he retaliated

against Plaintiff's filing of a grievance and this lawsuit by improperly reclassifying him

and transferring him to other facilities. Defendant Reinke moves for summary judgment

on these claims because: (1) in his official capacity he is immune from liability: (2)

Defendant Reinke was not deliberately indifferent to Plaintiff's mental health care; (3)

Defendant Reinke did not participate in the routine and appropriate reclassification of

Plaintiff and his transfers among prison facilities, nor did these actions chill the exercise

of Plaintiff's First Amendment rights; and (4) he is entitled to qualified immunity. (Dkt.

96-1.)

At the outset, Defendant Reinke argues that if Plaintiff's claims are made against

Defendant Reinke in his official, rather than individual capacity, they must be dismissed

because a state official is not a "person" under the § 1983, and the Eleventh Amendment

provides immunity from Plaintiff claims for which he seeks only monetary damages. (*Id.*,

p.2.) However, Plaintiff concedes in his opposing brief that he "is not suing Reinke in his

official capacity"; therefore, this portion of Defendant Reinke's argument is moot.

**MEMORANDUM DECISION AND ORDER- 37**

As to Plaintiff's Eighth Amendment claim that Defendant Reinke was deliberately indifferent to Plaintiff's serious medical need, the Court agrees that summary judgment is appropriate because there is no material factual dispute regarding Defendant Reinke's deliberate indifference. In the preceding analysis of Plaintiff's Eighth Amendment medical claim against Corizon, the Court has already determined that PTSD is a serious medical need. However, Plaintiff must also show that Defendant Reinke was deliberately indifferent to his PTSD. Deliberate indifference is a high standard to meet, set forth by the United States Supreme Court, and exists only when an official knows of and disregards a serious medical condition or when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Farmer,* 511 U.S. at 838.

Plaintiff argues that alleged fines totaling more than $382,500 against Defendant Corizon, and Defendant Reinke's signature to a Stipulated Motion to Modify Injunctive Relief in another case involving psychiatric care at ISCI are "proof of deliberate indifference." (Dkt. 101, p.3.) Beyond these allegations, however, nothing in the record of this case supports Plaintiff's contention that these alleged fines and stipulated motion in a separate litigation establish Defendant Reinke's knowledge and disregard of Plaintiff's PTSD.

Plaintiff also claims that because Defendant Reinke is the Director of IDOC, he is "ultimately responsible" for the health and safety of IDOC prisoners including Plaintiff. (*Id.*, p.4.) While it is true that Defendant Reinke is the Director of IDOC and oversees the

**MEMORANDUM DECISION AND ORDER- 38**

overall operations of IDOC and its facilities, he has very little personal contact with individual inmates. Defendant Reinke is not involved in the daily operations of any IDOC facility or ICC, nor is he involved in or aware of the medical care of any IDOC inmate, including the mental health care that was offered or provided to, or denied or refused by Plaintiff. Furthermore, Defendant Reinke has never met or communicated with Plaintiff, and has never received any concern forms, grievances or requests for mental health care from the Plaintiff. (*See* Dkt. 96-3.) Based on these undisputed facts, the Court finds that Defendant Reinke did not know, nor was he ever made aware, of Plaintiff and his PTSD condition. Thus, Plaintiff's claim that Defendant Reinke was deliberately indifferent to his serious medical need fails.

Alternatively, Plaintiff's Eighth Amendment claim against Defendant Reinke will also be dismissed for failing to show that Defendant Reinke personally participated in the alleged inadequate medical care. The Court reminds Plaintiff once again that liability under § 1983 only arises upon a showing of personal participation by the defendant. *Arnold*, 637 F.2d at 1355. There is no respondeat superior liability under Section 1983, so a supervisor is liable for constitutional violations of his subordinates only if the supervisor knew of, participated in or directed the violations. Thus, Plaintiff's failure to provide any evidence that Defendant Reinke had any personal or supervisory participation in, knowledge of, or control over the mental health care provided to Plaintiff is another reason to grant summary judgment in favor of Defendant Reinke.

Plaintiff's remaining claims against Defendant Reinke involves the First

**MEMORANDUM DECISION AND ORDER- 39**

Amendment. Plaintiff claims Defendant Reinke retaliated against him in violation of his First Amendment rights on two different occasions: (1) when Plaintiff was transferred to an Oklahoma facility in July 2008 after Plaintiff filed a grievance against ICC; and (2) when Plaintiff was "arbitrarily" reclassified in April 2010 and transferred from ISCI to ICC in September 2010 after Plaintiff filed the instant lawsuit. (Dkt. 20, pp.1-8.)

To prevail on a First Amendment retaliation claim, Plaintiff must provide facts that establish the following: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). A "chilling effect on First Amendment rights" is enough to state an injury. *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001).

Plaintiff has not submitted any competent evidence to support his retaliation claims. Regarding Plaintiff's first claim of retaliation involving his transfer to an Oklahoma facility in July 2008, Defendant Reinke states that he is and was not involved in the day-to-day operations of IDOC facilities, including the decisions regarding inmate transfers. More specifically, he was not involved in any way in Plaintiff's transfer to Oklahoma in July 2008. (Dkt. 96-3, p.2.) IDOC records show, and Plaintiff has not refuted, that Plaintiff did not file any grievances (or send any to Defendant Reinke) for at

**MEMORANDUM DECISION AND ORDER- 40**

least eight months prior to his transfer to the Oklahoma facility in July 2008.[6] (Dkts. 95-9, p.5.; 95-13, p.2.) In addition, transfers are common in prisons and prisoners do not have a federally protected liberty interest in being housed in a particular facility. *See, e.g.*, *Meachum v. Fano*, 427 U.S. 215, 225 (1976); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). In Idaho, prisoners are routinely transferred and done so based on one of the four legitimate penological interests described above: case plan requirement, security requirement, medical requirement or departmental requirement.

Prior to his July 2008 transfer to the Oklahoma facility, Plaintiff was housed at three different facilities – ISCI, IMSI and ICC – and within those facilities his unit, block or bunk assignment was changed 12 different times. (Dkt. 91-11, p.2.) Plaintiff has failed to demonstrate that his next transfer to the Oklahoma facility was in any way a retaliatory move by Defendant Reinke. The records shows that Defendant Reinke is not involved in prisoner transfers and had no involvement in the decision to transfer Plaintiff in July 2008. Plaintiff has not identified the alleged grievance that was the basis for the purported retaliation, he has not shown that the transfer did <u>not</u> advance one of IDOC's four legitimate penological interests, and he has not shown that the transfer to the Oklahoma facility chilled the exercise of his First Amendment rights; Plaintiff continued to file inmate concern forms upon his return to Idaho. (*See* Dkts. 95-4, pp.14-15.) Accordingly, Plaintiff's first claim of retaliation against Defendant Reinke fails.

---

[6]The only grievance in the record is one dated February 27, 2007 in which Plaintiff complains about ICC Medical refusing to let him see a psychologist. The grievance was returned without action for the reason that Plaintiff "cannot grieve disciplinary issues. Contact the DHO to file an appeal for a DOR." (Dkt. 99-1, pp.5-6.)

MEMORANDUM DECISION AND ORDER- 41

As to the second claim of retaliation, Plaintiff's claim likewise fails because as noted above, Reinke is and was not involved in daily prison operations, including the reclassification and transfer of individual prisoners. He specifically was not involved in Plaintiff's April 2010 Reclassification, or Plaintiff's transfer from ISCI to ICC in September 2010. (Dkt. 96-3, p.2.) Additionally, there is no causal connection between the prison's reclassification and transfer and the lawsuit he filed. Plaintiff was reclassified in April 2010, three months before he filed this lawsuit, and the reclassification was done in accordance with IDOC standard operating procedures. (Dkts. 96-4, p.4; 96-8, p.2.) Finally, the record is devoid of any evidence that Plaintiff's transfer in September 2010 was <u>not</u> a routine transfer in line with one of IDOC's four penological interests set forth above.

Based on the foregoing, undisputed evidence, Plaintiff has failed to create a triable issue of fact to support his claims that Defendant Reinke had any involvement whatsoever in his reclassification and facility transfers, and that such actions were retaliatory in nature and violated his First Amendment rights. Accordingly, the Court will grant Defendant Reinke's Motion for Summary Judgment.

Finally, Defendant Reinke argues that he is entitled to qualified immunity as to each of Plaintiff's claims. In Section 1983 actions, the doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate clearly-established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). A qualified immunity

analysis consists of two prongs: (1) whether the facts as alleged by plaintiff establish a violation of a constitutional right, and (2) whether that right was clearly established given the state of the law at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236. However, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

Here, it is both beneficial and expeditious to address the first prong of the *Saucier* analysis – whether Plaintiff has alleged facts establishing a violation of a constitutional right. In the foregoing analysis of Plaintiff's claims against Defendant Reinke, the Court has determined that Plaintiff has <u>not</u> alleged sufficient facts establishing that his First Amendment or his Eighth Amendment rights were violated. Thus, Defendant Reinke is entitled to qualified immunity and it is not necessary to address the second prong of the *Saucier* analysis.

## ORDER

**IT IS ORDERED:**

1.      Plaintiff's Motion for Leave to File Affidavit (Dkt. 85) is **GRANTED**.

2.      CCA Defendants' Objection to Plaintiff's Motion for Leave to File Affidavit and Motion to Strike Affidavit (Dkt. 86) is **DENIED**.

3.      CCA Defendants' Motion for Summary Judgment (Dkt. 91) is **GRANTED**. All claims against Defendants CCA, Valdez and Rodriguez are hereby dismissed with prejudice.

4.      Defendant Corizon, Inc.'s Motion for Summary Judgment (Dkt. 95) is **GRANTED** and all claims against Defendant Corizon are hereby dismissed with prejudice.

5.      Defendant Reinke's Motion for Summary Judgment (Dkt. 96) is **GRANTED** and all claims against Defendant Reinke are hereby dismissed with prejudice.

6.      Plaintiff's Motion for Leave to File Supplemental Pleadings Rule 15  Fed. R. Civ. Procedure (Dkt. 107) and Motion for Supplemental Pleadings Rule 15(d) Fed. R. Civ. Procedure (Dkt. 108) are **DENIED** to the extent Plaintiff has not filed any supplemental pleading with these Rule 15(d) Motions, but Plaintiff's request to submit the Higgins Report in support of his response to Defendants' Motions for Summary Judgment is **GRANTED**.

SO ORDERED.

**MEMORANDUM DECISION AND ORDER- 44**



DATED: **September 27, 2013**

Honorable Edward J. Lodge
U. S. District Judge

**MEMORANDUM DECISION AND ORDER- 45**